The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Before we begin this morning, we have a motion for admissions to the bar. Judge Steinberg. Thank you. I'd like to move the admission of my four law clerks to the bar of this court. First is Chris Abernathy. He's a member of the Bar in Good Standing of the Highest Court of California. And then next is Stephanie DeBrow, who is a member of the Bar in Good Standing of the Highest Court of Texas. Patrick Hughes, who is a member in good standing of the Highest Court of Maryland. And Janice Littoff, who is a member of the Bar in Good Standing of the Highest Court of Texas. And they've all worked for me for almost a year now. They've been absolutely outstanding law clerks and I have knowledge of their credentials. I'm very satisfied that they possess the necessary qualifications. If you'd like, your motion is granted and the applicants will be admitted. If the applicants will now face the clerk, he will administer the oath of office. Please raise your right hand. I solemnly swear or affirm that you will report yourselves as attorneys and counselors of this court, uprightly and according to law, and to support the Constitution of the United States of America. I do. Congratulations and welcome to the Bar of the United States Court of Appeals. Thank you and welcome. Very well, we have one case on for argument this morning. Monsanto Company against Bowman, number 2010-1068. Mr. Walters. Good morning and congratulations to our new admittee. May it please the court, my name is Mark Walters, a former Lawrence and Howe for the appellant Vernon Hugh Bowman. With me is my colleague Dario Macklight. We respectfully ask that you reverse the district court's order of summary judgment and enter judgment in favor of Mr. Bowman because we believe that the seeds that were sold to Mr. Bowman, rights in those, were exhausted as a matter of law. In the alternative, we ask that this court vacate the district court's damages award and find that Monsanto failed to mark the seeds that were in the grain elevator that were sold to Mr. Bowman. In this case, the allegedly infringing activity involved Mr. Bowman planting commodity seeds that he purchased from a grain elevator. In our brief, we identify the exhausting sale as the sale from Monsanto or its licensed seed seller to the grower. I believe it's important that we examine the ability, if any, that Monsanto has to control distribution or sale of those first generation seeds because it's critical in answering the question as to what patent rights Monsanto might have in the second generation seeds. You both, on both sides, it seems to me, speaking for myself, have some difficulty in accommodating yourself to what the Supreme Court has told us to do. In the general talking pictures case, which hasn't been overruled and, in fact, was cited with approval in quanta, the Supreme Court made clear that you can have a sale with field use limitation in it and that that field use limitation is binding on the purchaser who purchases with knowledge. At the same time, it's clear, I think, that there has to be knowledge under general talking pictures. So what is the knowledge situation here with respect to Bowman? If you assume that there was a field of use limitation in the original licensed sale to the original farmer, did Bowman have knowledge of such a limitation and how does that fit in? Your Honor, I'll take the first part of that question. We don't agree that it's a field of use license, but I'm going to assume that it is for your question. And I believe that Mr. Bowman didn't have notice of that restriction. And I believe that the notice that is actually important in the general talking pictures case is the notice by the licensee who's making that sale. We don't argue that a licensee who's acting outside the scope of his license is not subject to a claim for patent infringement. We agree that sales made by licensees outside the scope of their license are subject to patent infringement. And that the purchaser who purchases with knowledge is also liable for infringement. Absolutely. Absolutely. And I think the reason, and I think you touched on this too, Judge Dyke, the reason that the sale in general talking pictures was unauthorized and outside the scope of its license was because the seller knew that the purchaser was not going to use it for personal use. I submit that if the seller in that case, general talking pictures, reasonably believed that his purchaser was going to make a personal use within the scope of the license, that would have been a lawful sale and there would have been exhaustion. The key point for the exhaustion doctrine is the exercise of the authorized sale. That's one of the exclusive rights granted to patentees. And once that occurs, an authorized sale for that particular article or something embodying that article, patent rights end. Let me see. I'm not sure I understand exactly what you're saying about general talking pictures. Are you saying that if, we've got A, B, and C. A is the patentee, B is the original purchaser, and C is the party to whom the original purchaser passes on the good. Okay. Are you saying that if C truthfully tells B that C intends to make an unauthorized use of the good, that is to say, an use of the good that wasn't authorized by the license from A to B. Yeah. Then C is liable under patent law for infringement. But if C lies to B and says that C will comply but intends and does not comply, that the patent law doesn't have any application? That's not what I'm saying, Your Honor. Okay. Explain what's the difference between what you were saying and what I was asking. What you're saying, I'm talking about the sale, the first authorized sale. That's the important sale. That's from A to B. Right. And that sale, by hypothesis, is with a restriction. That is with a post-sale restriction. Okay. That's different from a limited field of use license. We've got a different situation. Okay. These seeds are sold by Monsanto to the farmers. They're not licensed. Okay. Let's get away from the seeds for a moment. All right. Deal with my hypothetical. In a limited field of use license situation where you have one who's selling B with limited rights, that person, that licensee, does not have complete rights to make an authorized sale except for in these certain categories. Right. And now your facts, as you were talking about them in your example, were that C then says, well, I'm only going to use the product in that limited way. Correct. Does that immunize C from patent liability if C uses it for other purposes? Well, Your Honor. It seemed to me you were saying it did. I am saying it did. And that's the way I said it. Okay. Yeah, you're right. Okay. That is what I said. And I believe that the general talking pictures case would have been decided differently if you have an owner who made an authorized sale. I do believe that as soon as that authorized sale, that right to sell is exercised in a lawful way. The patent rights to that article are exhausted. Look at the Adams v. Bergman. That's a difficult reading of general talking pictures because it makes quite clear that a purchaser with knowledge of the restriction is also liable as an infringer. So that's what I mean about accommodating yourself to general talking pictures. We've got to – I mean it may be the Supreme Court doesn't like general talking pictures, but it's our job to apply it the way they wrote it. It hasn't been overruled. I think the easiest or the best position for me to take at this point, we don't believe that general talking pictures is the controlling case, and that's because this is not a situation of a limited field of use licensee making a sale outside the scope of its license. What we have here are – But, I mean, it seems to me that that's the heart of the question. We have at least three parties here. We've got the original farmer who sold the grain elevator. We've got the grain elevator, and we've got Bowman, right? What do we know, if anything, about the sale from the original farmer to the grain elevator? The original farmer would violate his license if he sold the seeds for planting, but we don't know whether the original farmer sold to the grain elevator for planting. In fact, maybe the structure of the industry suggests that there's no discussion about the use of the seeds when you sell it to a grain elevator. I assume that there is no discussion, but I don't know, and that's not something that was touched on. But what I submit is that these sales can't change in character because of some subjective mind change by the purchaser. What we need with the exhaustion doctrine is certainty. That's your problem. I mean, you can't – you're going too far because general talking pictures says that it does turn on what the purchaser knew and whether he knew that the sale was outside the scope of the license. I think my reading, Your Honor, of general talking pictures is that the key knowledge element is of the seller. No, except hypothetically. Okay. You're wrong. Okay. Let's accept that. All right. If the purchaser knew, the purchaser is also liable for infringement. So we are tasked with trying to figure out how that fits in with the fact situation here. The original farmer would exceed the scope of his license if he sold the seeds for purposes of planting, but we don't know whether that happened or not. The difference here is that we've got a sale in general talking picture of a licensed seed with limited rights to sell. We have sales by Monsanto with all rights to sell, sales by Monsanto's licensed seed sellers, which, according to the cases that we've cited in our briefs, have complete rights to sell. This is not a sale by someone with limited rights. So when they exercise their rights to sell lawfully, their rights are exhausted. It's not your position that the farmers have the unlimited right to sell the second-generation seeds, is it? Your Honor, it's our position that if the farmers take the first-generation seeds in a lawful sale, they pay the money that Monsanto charges for those seeds. They have possession and ownership. They take ownership of those seeds outside the scope of the patent law. If they are allowed to use those seeds, the only reasonable use is to grow more seeds. Wait, no. The other reasonable use is to sell them as food. Not for the first-generation seeds, Your Honor. These are genetically engineered seeds that have the germ plasm tweaked by Monsanto's engineers. They are of a certain variety. They are at a cost that is far above. I think literally, yes, you can grind them up. You take a first-generation seed, and you've got two things you can do with it. Really only one thing. Realistically, you're right. You wouldn't eat your seed that you've just bought from the seed company, but you plant it. When you plant it, out comes a huge new crop of seeds, the beans. Monsanto says you have one lawful use and one unlawful use of that crop. The lawful use is to sell it as food. The unlawful use is to use it for seed. And so it seems to me you do have an option of what to do with the first seeds. Yes, you put them in the ground, but then your options are limited. Your obligation is to use it as food. Well, what happens after you plant them and the new seeds grow, the farmer then is vested with full ownership and title in several new seeds. And our law tries to settle his title. But he can't sell it for planting. He's got to sell it either for consumption or food. And if he doesn't, he violates their contract, Your Honor, and I agree they have contract rights. He's also an infringer. I don't believe he's an infringer, Your Honor. Okay, but accept that he is. Okay. Just accept that because it's going to be more useful, I think, to get to the heart of this if you just accept that. That's what General Talking Pictures said. He's an infringer. And the person he sells to is an infringer too if he knows about the license limitation. Okay. So how does that fit into the facts here? Is Bowman in a situation where he knew is the original farmer in a situation in which he violated the license by selling to the grain elevator? Under your facts, Mr. Bowman is not an infringer. And assuming that General Talking Pictures is the controlling case, Mr. Bowman is not an infringer because he didn't know that there were any patent rights in those seeds. And the seller, grain elevator, certainly didn't know. The grain elevator has a mixed silo full of unpatented and patented seeds. Well, Mr. Bowman was certainly placed on notice of the patent rights in the technology agreement, which had limitations on what he could do with those second-generation seeds. You're talking about the Pioneer Hybrid Technology Agreement, Your Honor, I believe. And this is the one that addresses his purchase of the first-generation seeds. But it also talks about the progeny of those seeds. Absolutely. But what we have in this situation is a man buying from a grain elevator that has a mixture of seed. And Mr. Bowman is not a geneticist. And even Monsanto had to test the seeds before they could confirm that there was infringement. So I don't know how he could take possession of the seeds from the grain elevator and believe that he was infringing. A more basic question that troubles me about this case is it's not clear to me why the exhaustion doctrine has anything to do with this case, since the seeds that Mr. Bowman bought were not the original seeds that were sold subject to the technology agreement. So why isn't this a case in which Mr. Bowman, regardless of where he obtained the seeds, is infringing the patent on the genetic invention, without regard to the purchase or the origin, whether it was one generation of seeds removed or two or three? You're talking about claims that are drawn to the sequence or to something that's tied, claims that are… Sure. I can answer that, Your Honor, by looking at LGE versus Quanta and the principle that the invention is embodied in those seeds. Well, you say the invention is embodied. Let me give you an example. Suppose that we have a machine, we'll call it the replicator, which is a machine that will reverse engineer and replicate any electronic circuit. All you have to do is you put it in the machine and pull it out and the machine will pop out an exact copy of that circuit. So you have purchased, let's say, a 5G telephone, a brand new circuit that's patented. You buy that telephone, you put the circuit for that telephone in your replicator and out comes an exact copy of the circuit. Well, you can sell the phone to somebody else. You have patent exhaustion type rights in that. But I don't see how you have patent exhaustion rights in the product of the replicator. And I don't believe you do, because the patent exhaustion… Why isn't that this exact case? Because what you've done is you've taken the seed and you've put it in ground and the ground is the replicator and out comes a different product. It has the same genetic code, but it's a different product. Hypothetical. How? Because what you have in your hypothetical is somebody making a new product, which is not a right under the patent act that's exhaustive. What we have, when you put the seed in the ground, is use. Use is exhaustive. No, you're making a new product. You're making a new plant. That is use. It's both. Well, it's both, and I'll take use. It is certainly true that you're using it, but you're also using the device when you put it in the replicator. Well, but you are actually taking molecules and you are manipulating and making things. These seeds are not made. They are the product of use. You plant the seeds, and if you want to use those seeds that you buy for such a high price from Monsanto, you plant them and you grow more seeds. And that is the right of use that is exhausted from the first office they're at sale. I've ended my rebuttal time. We'll save your rebuttal time. There are a lot of things you can do with those. Once you plant the first-generation seeds and the second-generation seeds sprout forth, there are a lot of things you can do with them. And obviously, farmers do it for the purpose of creating a crop that they can then sell. They can use it as feed. They can do any number of things except for planting, because those are conditions that were imposed. Now, why does that not matter in this circumstance? Your Honor, one of the most important policy goals of our law is to settle title in personal property. And I believe that when a farmer takes ownership of that seed, plants the seed and grows more seeds, he owns – as a matter of fact, he does own those seeds. And he is allowed to enjoy those seeds and to grind them up, to sell them. He may violate some contractual rights he has with Monsanto. But because that first-generation seed was sold and rights were exhausted in that, if he violates these post-sale restrictions, then he might be liable for contract law. And that doesn't leave Monsanto without a remedy, without an ability to exploit their technology. They can enter into contracts with grain elevators. They can enter into contracts with farmers. They can be more vigilant on enforcing where their seed goes. I think there – it's a very laudable policy goal to make sure that we identify and separate the genetically modified foods from non-genetically modified foods. At current, there is no source for organic or non-genetically modified soybean in Knox County. Very well. Why don't we hear from the opposing counsel, and we will restore your full rebuttal time. Mr. Wilson. Thank you, Your Honor, and may it please the Court. Paul Wilson on behalf of Monsanto. Monsanto's patent rights in the soybeans that Mr. Bowman planted were not exhausted because those soybeans were never the subject of an authorized and unconditional sale. I'm not so sure about that because suppose the original farmer who had the technology license sells to the grain elevator. He has no idea what the grain elevator is going to do with him. Normally, grain elevators sell the stuff for consumption. Is he exceeding the license by selling to the grain elevator without securing some promise from the grain elevator not to sell the seeds for planting? No, I don't think the grower is exceeding his authority there. If the grower is selling to the – assuming the grower has validly harvested, has validly secured a license and so forth, and the grower sells to the grain elevator, that is a channel of commerce that Monsanto has authorized. So how is it an unauthorized sale? It's an unauthorized and – it's not an authorized and unconditional sale because all that he has been authorized by Monsanto to do is transfer the use of those soybeans as a commercial crop, as food or feed, and not for replanting. But there's no requirement in the license agreement that he secure any promise from the grain elevator as to what it does with the seeds. I mean, he's not – when he sells it to the grain elevator, you seem to agree he's not selling it for planting. So why isn't he making an authorized sale to the grain elevator, which results in patent exhaustion? Well, the grain elevator – I mean, Mr. Bowman testified at his deposition that he understood that the grain elevator could not sell the outbound soybean for seed planting purposes. I mean, he – so this goes also to your question, Judge Dyke, about whether he had knowledge, if you think about it in terms of the general talking pictures point. I mean, the custom is the grain elevator – to be a – to sell seed in Indiana and elsewhere, there are extensive licensing restrictions, and as Mr. Bowman testified at his deposition, the seed has to be bagged, it has to be labeled, it has to display the varieties and what percentage, and is there a germination rate? And none of that was done because Mr. Bowman purchased the soybeans from the grain elevator as a mass of undifferentiated soybeans. But he may not have even known at the time he purchased it that it was – it included Roundup Ready seeds. Well, he had an idea that it had purchased Roundup Ready seed, and after all, he did spray – After the purchase. Well, he did spray glyphosate over the soybeans, and he – I mean, he testified quite frankly at his deposition that he had sort of hit upon what he thought was a bright idea, which is I can get cheap soybeans for my second crop – At the time he purchased them? Yes. He knew that this was the point of it, and he was very happy to discover that the soybeans that he planted were glyphosate-resistant. And then, of course, let's not forget, he then saved the harvest from those soybeans and planted those again. Now, he continued to buy a few soybeans each year from the grain elevator. But he then planted the third generation and the fourth generation and so forth, as to which, you know, those soybeans were never sold by anybody. Mr. Wolfson, I want to go back to the sale by Mr. Bowman to the grain elevator, and I want to make sure that I understand your position. Are you saying that his sale, which was unconditional, he simply sold these seeds to the grain elevator? That's true. So I don't think that Mr. Bowman – I don't think that Mr. Bowman necessarily – I think Judge Lynn is asking about the sale by the original farmer. By the original farmer, right, to a grower. If the grower – I mean, the grower – yes, the assumption is the grower will sell to a grain elevator or to some other commercial entity that then intends to sell it to an agricultural producer or could sell it to somebody for use as food or feed. But I don't think there's anything magic about the fact that the sale is to a grain elevator. But the question I have is whether that sale was with conditions or not. That sale was with conditions. Well, I would say the sale was a transfer only of limited use rights because the only right that Monsanto had ever granted to that grower to do with the second generation seed was to sell it as a commercial crop. But how do we know that that limitation was made known to the grain elevator? Well, I think we don't – I mean, of course, we don't know. We don't know because we can't ever trace back – we can't know who the grain elevator bought a particular soybean from, so we don't know who the grain elevator ever got the specific soybeans from, the growers. But I would say – first of all, I would say I don't think it matters because I actually think that the Supreme Court case law says that the limited use of the article follows the article. And indeed, in Mitchell v. Hawley, which is kind of the leading – That's a hard read. Well, I think that – Because General Talking Pictures emphasizes the knowledge. Well, General Talking Pictures certainly did emphasize that the purchaser had knowledge as well as the seller. But Mitchell v. Hawley, which is the case involving the hat felting machines, and in that case the patentee authorized the manufacturer to sell the machines for the duration of the patent and then the patent was only – and the recipient could only use them during the original patent term. And then the patent term was extended. And the Supreme Court said you can still go after the person who was using them after the patent term was extended because they never got an additional license for that additional term. And it doesn't matter that they received – that they never received notice because you can never transfer more rights than you ever received before. Let me ask you the same question I asked the – I'm sorry. That's my point. That is my point, yes. I didn't want to cut you off. That is my point, yes. All right, perfect. Let me ask you the same question I asked your opposing counsel, which is I'm a little unclear as to why patent exhaustion really has anything to do with this case because we're not talking about the particular products that were sold by Monsanto. We're talking about progeny, perhaps several generations removed from those products. And why does patent exhaustion have anything to do when you're not talking about rights in the same product or a product that embodies a process? Well, I don't think it does. I mean, our – I mean, my colleague said that he thought that the exhausting sale was actually the sale of the first-generation seed. I don't – I mean, this Court has already rejected the argument that the sale of the first-generation seed exhausts anything in the second and third because those are entirely different articles. Yes, they exhibit the same genetic trait, but the Court made clear in Scruggs and in McFarling 1 that one has to examine whether each generation to see whether the patent rights were exhausted just as you would have to examine each article in any generation. And Quanta – I don't think Quanta does anything to unsettle that framework. I mean, Quanta, to be sure, Quanta reiterated that when a particle embodying a patent has been the sale of an unconditional authorized sale, the patent rights are exhausted in that article. But we're talking about a particular item. Correct. No, absolutely. And here, unless you view all generations of soybean seeds as being the same item, we're not. I think that's exactly right, and I think that that really does relate to one of the principal purposes of the exhaustion rule, which is that the notion is that when somebody makes an unconditional authorized sale of the item, the patentee gets his full reward in that that he might be expected to get also at a price that would make commercialization of the invention reasonable. But in the case of self-replicating technology, especially soybeans that replicate glyphosate-resistant soybeans that replicate at something like 36 to 1, you know, it can depend. The patentee – there's no way the patentee could recoup its investment through the sale of the first generation. I think what Judge Bryson is saying to you is that when you purchase an item and the patent rights are exhausted, that doesn't give you the right to replicate the item and that that's a separate infringement. That is not an argument that you have made so far, right? No, that is an – I mean, that is definitely an argument that features in our brief, that the sale of the first generation article does not – does not – even assuming that that's an exhausting sale of that article, and we actually don't agree with that, but the sale of the first generation article does not really tell you anything about exhaustion of patent rights in the second generation or the third generation. Well, I think the question here, though, is – suppose there were no field-of-use limitations, there were no technology agreements, I think that under the theory that Judge Bryson is asking about, it would still be an infringement to replicate by planting the seed and creating a new generation. Well, it would certainly be an act of infringement to plant the second-generation seed and make a third-generation seed unless you had been – or, indeed, unless you had been authorized by Monsanto to do that or, indeed, to do anything with it. You need authority to do – Is that the act of using the technology? Correct. You need authority to do something with the second generation. And, I mean, this court has – I mean, this court has had several cases involving Monsanto's damages model, and it's also reflected in the expert opinion in this case, and as the court has understood, there's no way that Monsanto could sort of recoup its investment for multiple generations of soybeans by charging a technology fee in the first generation because it would just be – and the invention would never be commercialized successfully. I think the argument, coming back to the exhaustion thing, is that what Qantas says is you've got to dot your I's and cross your T's if you want to get this done right, and the argument is you didn't do that. It wasn't enough to restrict the first-generation – the first-purchasing farmer. You had to obligate him to restrict the people to whom he sold, and you didn't do that. So there's a way of doing it, but you didn't do it. I would actually maybe – actually think of it as a little – possibly the reverse, actually, Judge Dyke, which is what Qantas actually says is it's not enough that you just tell your licensee, tell the next person you can't do it. You know, in other words, if you recall, in Qantas, Intel, I believe, was – all that they were really required to do was just sort of tell Qantas, oh, by the way, you may have an issue with LG. Go back to them and maybe see if you owe them some money, but otherwise there were no restrictions placed on what Intel could do with the manufactured products that embodied the invention. But here, in fact, I think it's sort of the mirror image of that, which is actually Monsanto makes quite clear to the growers the only thing you can do with the second-generation seed is to sell them as a commercial crop, and that is – I think that is a limited-use restriction on the second generation, just as the particular use of the amplifiers was in General Talking Pictures. They could only be sent into one channel of commerce and not into another, and a case that General Talking Pictures cites and discusses, the Goodyear rubber case. Suppose in General Talking Pictures that the first purchaser who brought it for non-commercial use had sold it to somebody else without informing them of the restriction. Would that third-generation purchaser be an infringer? I think – I recognize that General Talking Pictures points out that there was knowledge, but I think that there is a good argument that that would be an infringer because – Even if that person didn't have – Correct, because the product is only being sent into one authorized channel, and that was – in General Talking Pictures, it was home use and not commercial use. And I think the idea is that – one of the ideas is that the patentee is entitled to decide what uses the object is going to be put to, and its investment – it would recoup its investment quite differently. Here, I think it's quite similar, and as I think this Court has recognized on many occasions, if Monsanto weren't able to strictly limit what the second-generation seeds and soybeans were done, it could very well quickly put itself out of business. And as I said, there's nothing magical, I think, about the fact that the purchase was from the grain elevator. If a farmer had sold to his neighbor and said, you know, use this to feed your hogs, but the neighbor then converted it to planting purposes, the neighbor would be infringing because he would never have received authorization from Monsanto to use the soybeans for that purpose. But here we don't know whether the farmers that sold to the grain elevator said anything to the grain elevator about, well, here you are, you can use these for commodity reasons, not for planting. We don't, but I don't think it matters under the proper exhaustion analysis, and also, as we've pointed out, exhaustion is an affirmative defense, so I think the burden is not on us to, in any event, to establish what the subject of that conversation was. The Court has nothing further. Thank you. Thank you. Mr. Walters, two minutes for rebuttal. I'd like to touch briefly on something that was said by my colleague about Mr. Bowman coming up with this idea to plant the commodity seeds. It's something that he had been doing for a long, long time before Monsanto came around, and it's something that farmers have been doing for generations in that area, second cropping, using seeds that come from a commodity source. It's a riskier crop. They need to have the ability to do that, and that's what Mr. Bowman was trying to do. On the idea of whether or not this was an unconditional sale and the citations to Mitchell v. Hawley, the seller in Mitchell v. Hawley, again, was a licensee, and I think it's important to understand what the Supreme Court means when it says conditional sale back in the late 1800s, and it means a sale that is where title doesn't pass, and I think you can see the case that we cite for this is Harkness v. Russell. It says that a conditional sale is, quote, mere agreements to sell upon a condition to be performed, or a sale, quote, with a reservation of a lien or mortgage to secure the purchase money. These are absolute sales that are happening in this case. These are not conditional sales as that term was used by Mitchell v. Hawley. On Scruggs v. McFarling, McFarling and Scruggs didn't confront the argument that we're making here, and that is the first generation seeds are exhausted because malincrot is not the controlling case, and that malincrot is a departure from the traditional exhaustion doctrine, and they were both based on the malincrot case, and that's why they were decided the way they were. They didn't confront the argument that we're making here, and that is when an owner of those seeds plants them and uses them, exercises his or her right to use them, he's vested with or she is vested with full title in those seeds and can dispose of them as he or she wishes. And on this idea of whether or not Monsanto gets full reward for their investment, I don't know if there's any evidence in the record as to what the value of the technology is, and they charge an awful high price, I know that, but I don't know if there's any evidence that they're not getting full value for that when they collect their money up front, and they can also enter into contracts if they believe that they're entitled to more downstream. So unless there are any more questions. Now, the district court seems to have made what appears to be either an assumption or a finding of fact. I guess it depends on how you view it, that Mr. Bowman did anticipate that a large percentage of the beans he bought would be Roundup ready. Do you take issue with that based on the record? Based on my understanding of the record, I don't think I take issue that he thought that might be a reality. And that as a consequence, he treated them with – He made a test. He tested those, but I think it's absolutely true. He, in effect, discovered that they indeed were substantially Roundup ready. And I want to be careful because Roundup ready, there's the patent infringement and whether or not those seeds infringe the patent, and then there is Mr. Bowman's test finding that some of those seeds survived an application of glyphosate. Does Mr. Bowman's test equate to infringement? I don't know. But he did test them to see if they were resistant to glyphosate. Thank you. Thank you. I thank both counsel. The case is submitted. All rise. The Honorable Court is adjourned from today to today.